[This decision has been published in *Ohio Official Reports* at 91 Ohio St.3d 389.]

THE STATE OF OHIO, APPELLEE, *v*. ORR, APPELLANT.

THE STATE OF OHIO, APPELLEE, *v*. SMITH, APPELLANT.

[Cite as *State v. Orr*, 2002-Ohio-50.]

*Constitutional law—Search and seizure—Motor vehicles—Criteria for determining constitutionality of a driver's license checkpoint.*

(No. 00-408—Submitted January 10, 2001—Decided May 2, 2001.)

APPEAL from the Court of Appeals for Montgomery County, Nos. 17476 and 17477.

————————

SYLLABUS OF THE COURT

In determining the constitutionality of a driver's license checkpoint, a court must evaluate, on a case-by-case basis, the checkpoint's intrusion on privacy, the state's interest in maintaining the checkpoint, and the extent to which the checkpoint advances the state interest.

————————

FRANCIS E. SWEENEY, SR., J.

{¶ 1} From June 8, 1998 through June 20, 1998, the city of Dayton operated a system of driver's license checkpoints designed to identify and remove unlicensed drivers and drivers with suspended licenses from the roads. The checkpoints were set up at various locations in Dayton, including major thoroughfares and "target enforcement areas"—districts characterized by problems of traffic and crime. Upon arrival at a checkpoint site, the police would set up reflective signs that warned drivers of the upcoming checkpoint. The checkpoints were staffed by anywhere between eleven and thirteen officers. Several police cruisers were also present at the checkpoints.

**{¶ 2}** As cars entered the checkpoints, they would be stopped according to some pattern that varied according to the amount of traffic on the road. If traffic was particularly light, every car would be stopped. Drivers who were stopped at these checkpoints were immediately advised of the purpose of the checkpoint and were asked to produce their driver's licenses. Drivers who produced a valid license would have their licenses returned to them along with a pamphlet explaining the checkpoint program and thanking them for their cooperation. The length of detention for those possessing a valid driver's license was usually about forty-five seconds.

**{¶ 3}** Drivers who were unable to produce a valid driver's license had their names, dates of birth, and Social Security numbers entered into the officers' computers to check whether they possessed a valid license. If the computer showed that a driver was properly licensed and was not wanted by the police for any reason, the driver would be given the pamphlet, thanked, and released back into traffic. This entire process would take an additional two minutes or so to complete. Drivers without a valid license were cited for the violation, which added approximately ten minutes to the overall length of detention.

**{¶ 4}** On June 17, 1998, appellant Magus Orr was stopped at a driver's license checkpoint and cited for driving without a license in violation of R.C. 4507.02(A)(1). That same night, appellant Andre Smith was stopped at a driver's license checkpoint at another location. Smith was cited for driving without a license in violation of R.C. 4507.02(A)(1), operating a motorcycle without the required endorsement in violation of R.C. 4507.02(A)(3), driving with expired license plates in violation of R.C. 4503.21, and operating a motorcycle without a helmet—required for novice riders—in violation of R.C. 4511.53.

**{¶ 5}** Both of the appellants pleaded not guilty. Each appellant also filed a motion to suppress, claiming that his seizure was unconstitutional under the Ohio and United States Constitutions and that all evidence obtained as a result of his

seizure should be suppressed. The trial court granted appellants' motions to suppress. The court concluded that because the state had offered no evidence to suggest that the driver's license checkpoints were a necessary or effective means of promoting roadway safety, they constituted an unreasonable search and seizure under the Ohio and United States Constitutions. The state appealed the trial court's decisions to the Second District Court of Appeals. In a consolidated case, the court of appeals reversed the trial court, concluding that driver's license checkpoints are a reasonable method by which to deal with the public danger posed by unlicensed drivers. Orr and Smith filed a joint notice of appeal. The cause is now before this court upon our allowance of a discretionary appeal.

{¶ 6} We are asked to decide whether Dayton's driver's license checkpoint program violated the search and seizure provisions of the Ohio and United States Constitutions. For the reasons that follow, we sustain the program's constitutionality.

{¶ 7} The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 14, Article I of the Ohio Constitution, which contains language nearly identical to its federal counterpart, also prohibits unreasonable searches and seizures.[1] Because Section 14, Article I and the Fourth Amendment contain virtually identical language, we have interpreted the two provisions as affording the same protection. See *State v.*

---

1. Section 14, Article I of the Ohio Constitution provides:

   "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."

*Robinette* (1997), 80 Ohio St.3d 234, 238, 685 N.E.2d 762, 766-767. The search and seizure provisions of the Ohio and United States Constitutions are implicated in this case because a vehicle stop at a highway checkpoint constitutes a "seizure" within the meaning of the Ohio and United States Constitutions even though the purpose of the stop is limited and the resulting detention brief. *Delaware v. Prouse* (1979), 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667.

{¶ 8} A number of federal and state courts have upheld the seizure of motorists at driver's license checkpoints. See, *e.g.*, *United States v. McFayden* (C.A.D.C.1989), 865 F.2d 1306; *United States v. Prichard* (C.A.10, 1981), 645 F.2d 854; *LaFontaine v. State* (1998), 269 Ga. 251, 497 S.E.2d 367; *State v. Cloukey* (Me.1985), 486 A.2d 143; *State v. Grooms* (1997), 126 N.C.App. 88, 483 S.E.2d 445. Although the United States Supreme Court has never fully considered the constitutionality of a driver's license checkpoint, it has repeatedly suggested in *dicta* that it would uphold properly administered driver's license checkpoints. For instance, in *Prouse*, the United States Supreme Court held that the Fourth Amendment prohibits a police officer from arbitrarily stopping an automobile for the sole purpose of checking the driver's license and registration. The court stressed, however, that this holding did not preclude states from developing methods for spot checks, including the "[q]uestioning of all oncoming traffic at roadblock-type stops." *Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673-674. Similarly, in *Indianapolis v. Edmond* (2000), 531 U.S. 32, ___, 121 S.Ct. 447, 457, 148 L.Ed.2d 333, 347, the Supreme Court invalidated drug interdiction checkpoints implemented primarily to uncover evidence of criminal wrongdoing but cautioned that its decision did nothing to alter the constitutional status of driver's license checkpoints.

{¶ 9} The United States Supreme Court's cases generally accord more Fourth Amendment protection to persons who are subjected to roving-patrol stops than to those who are stopped at roadblock, or checkpoint-type, stops like that

involved in the case at bar. The different treatment of checkpoint and roving-patrol stops makes sense, given the essential purpose underlying the Fourth Amendment. The Fourth Amendment "impose[s] a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasions." ' " (Footnote omitted.) *Prouse*, 440 U.S. at 653-654, 99 S.Ct. at 1396, 59 L.Ed.2d at 667, quoting *Camara v. Mun. Court of San Francisco* (1967), 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935. The crucial distinction between roving-patrol stops and checkpoint stops is the degree to which they intrude upon motorists' privacy and sense of security. "[T]he subjective intrusion— the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *United States v. Martinez-Fuerte* (1976), 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116, 1128. "At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *United States v. Ortiz* (1975), 422 U.S. 891, 894-895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623, 628. Many motorists accept checkpoint stops as incidental to highway use. *Martinez-Fuerte*, 428 U.S. at 561, 96 S.Ct. at 3084, 49 L.Ed.2d at 1130, fn. 14.

{¶ 10} In determining the constitutionality of a police checkpoint, courts evaluate the following three factors: (1) the particular checkpoint's intrusion on privacy, (2) the state's interest in maintaining the checkpoint, and (3) the extent to which the checkpoint advances the state interest. *Michigan Dept. of State Police v. Sitz* (1990), 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412. The United States Supreme Court has relied upon this analysis in upholding sobriety checkpoints— roadblocks at which drivers are checked for being under the influence of alcohol or mind-altering drugs—and roadblocks designed to intercept illegal immigrants. See *id.* (sobriety checkpoints); *Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49

L.Ed.2d 1116 (immigration checkpoints). The courts of several jurisdictions have extended the analysis to cases involving driver's license checkpoints. See, *e.g.*, *McFayden*, 865 F.2d 1306; *Cloukey*, 486 A.2d 143. We agree with those jurisdictions that have concluded that the analysis employed by the United States Supreme Court in its cases on sobriety and immigration checkpoints is appropriate for review of driver's license checkpoints. Therefore, we hold that in determining the constitutionality of a driver's license checkpoint, a court must evaluate, on a case-by-case basis, the checkpoint's intrusion on privacy, the state's interest in maintaining the checkpoint, and the extent to which the checkpoint advances the state interest. Applying this three-pronged analysis, we find that Dayton's driver's license checkpoints were consistent with the search and seizure provisions of the Ohio and United States Constitutions.

{¶ 11} Like most checkpoint stops, Dayton's driver's license checkpoints did not greatly intrude upon travelers' sense of privacy. Drivers approaching these checkpoints were warned in advance of their presence. At the checkpoint, drivers could see that they were not the only ones being stopped. Visible signs of the officers' authority were everywhere. Each checkpoint was manned by at least eleven officers, with police cruisers present. Drivers who were stopped were immediately advised of the purpose of the stop. Most of those possessing a valid license were sent on their way after only about forty-five seconds. Those who had a valid license but could not produce it at the checkpoint were dispatched after only a few minutes. Even those driving without a valid license were detained for only ten minutes or so. Every driver stopped at one of Dayton's driver's license checkpoints was given a pamphlet explaining the checkpoint program and thanking him or her for cooperating. Clearly, these checkpoints constituted a very limited intrusion into travelers' privacy and sense of security.

{¶ 12} Weighing against this minimal intrusion on privacy is the state's vital interest in using driver's license checkpoints to identify unlicensed drivers.

6

The state has an interest in ensuring that only those qualified to do so are permitted to operate motor vehicles and hence that licensing requirements are being observed. *Prouse*, 440 U.S. at 658, 99 S.Ct. at 1398, 59 L.Ed.2d at 670. "Automobile licenses are issued periodically to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to operate a motor vehicle." *Id.* See, also, R.C. 4507.11.[2] As the court of appeals noted, "Persons who are too young or too old to drive pose a threat to the public safety." *State v. Smith* (Jan. 14, 2000), Montgomery App. Nos. 17475, 17476 and 17477, unreported, at 24, 2000 WL 20882. "Persons who have had their licenses suspended for convictions of operating a motor vehicle while under the influence of alcohol often disregard their suspensions and drive anyway, endangering the public." *Id.* In short, the state has a critical interest in protecting its citizens from drivers who either are not qualified to drive or have been forbidden to drive because of a record of driving offenses.[3]

{¶ 13} Compounding the danger to the public from unlicensed drivers is the fact that much of the danger is hidden from plain view. While many types of dangerous motorists—drunk drivers, for example—exhibit erratic driving, the unlicensed driver often displays no observable characteristics. *Cloukey*, 486 A.2d at 147. Police officers on roving patrol cannot pull over a vehicle for the sole purpose of checking the driver's license and registration. *Prouse*, 440 U.S. 648, 99

---

2. R.C. 4507.11 provides:

"The registrar of motor vehicles shall conduct all necessary examinations of applicants for temporary instruction permits, drivers' licenses, or motorcycle operators' endorsements. The examination shall include a test of the applicant's knowledge of motor vehicle laws, including the laws on stopping for school buses, a test of the applicant's physical fitness to drive, and a test of the applicant's ability to understand highway traffic control devices."

3. According to Dayton's Police Driver's License Checkpoint Guidelines, adopted in 1998, of the almost 3.2 million drivers in the state of Ohio, approximately 800,000 had their licenses under some form of suspension. The introduction to the guidelines states that, in 1998, when the city of Dayton established its checkpoint program, approximately thirty percent of the traffic citations issued by the Dayton Police Department were for driver's license violations. It also reports that an estimated one in eight drivers on the streets of Dayton either did not have a driver's license or were driving under suspension.

S.Ct. 1391, 59 L.Ed.2d 660. Therefore, without checkpoints, the only way in which police can identify an unlicensed driver is by waiting for the driver to commit a driving offense. *Cloukey*, 486 A.2d at 147. In at least some instances, the offense would not even have occurred had the offending driver been detected earlier and been removed from the roadways.

{¶ 14} The final consideration in our three-pronged analysis is the extent to which the driver's license checkpoints advanced the state interest. This requires us to consider the Dayton program's effectiveness in identifying unlicensed drivers.

{¶ 15} In one two-week period, the Dayton police stopped 2,110 motorists and issued 224 traffic citations, resulting in a citation rate of approximately 10.6 percent. By constitutional standards, this effectiveness rate of 10.6 percent is quite substantial. Although there was no evidence of how many of these citations were related to licensing, even if only a fraction of the citations were issued for driving without a valid license, the effectiveness rate in the case *sub judice* would still exceed rates sustained by the United States Supreme Court in analogous checkpoint cases. See *Sitz*, 496 U.S. at 455, 110 S.Ct. at 2487, 110 L.Ed.2d at 423 (1.6 percent arrest rate for drunk drivers); *Martinez-Fuerte*, 428 U.S. at 554, 96 S.Ct. at 3081, 49 L.Ed.2d at 1126 (apprehension of illegal aliens in 0.12 percent of vehicles passing through checkpoint).

{¶ 16} In sum, assessing the checkpoints' intrusion on privacy, the state's interest in maintaining driver's license checkpoints, and the extent to which Dayton's checkpoint program advanced the state interest, we find that Dayton's driver's license checkpoint program was consistent with the search and seizure provisions of the Ohio and United States Constitutions. We affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment.

———————————

*Julia L. McNeil*, Dayton Director of Law, *John J. Scaccia*, Chief Administrative Counsel, and *Deirdre Logan*, Acting Chief Prosecutor, for appellee.

*Carl G. Goraleski* and *Anthony R. Cicero*, Assistant Public Defenders, for appellants.

*Betty D. Montgomery*, Attorney General, *David M. Gormley*, Associate Solicitor, and *David V. Patton*, Assistant Solicitor, urging affirmance for *amicus curiae* Attorney General of Ohio.

*Barry M. Byron*, *Stephen L. Byron* and *John Gotherman*, urging affirmance for *amicus curiae* Ohio Municipal Attorneys Association.

*Flanagan*, *Lieberman*, *Hoffman & Swaim* and *Richard Hempfling*, urging reversal for *amicus curiae* American Civil Liberties Union of Ohio Foundation.

———————————