[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Dunlap*, Slip Opinion No. 2024-Ohio-4821.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-4821

THE STATE OF OHIO, APPELLANT, *v.* DUNLAP, APPELLEE.

THE STATE OF OHIO, APPELLANT, *v.* LEWIS, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Dunlap*, Slip Opinion No. 2024-Ohio-4821.]

*Criminal law—Fourth Amendment to United States Constitution—Whether officer violated Fourth Amendment by asking driver for license after realizing that driver was not car's owner—Court of appeals' judgments reversed and trial court's judgments reinstated.*

(Nos. 2022-1227, 2022-1229, 2022-1237, 2022-1238—Submitted October 25, 2023—Decided October 9, 2024.)

APPEAL from and CERTIFIED by the Court of Appeals for Geauga County, Nos. 2021-G-0034 and 2021-G-0037, 2022-Ohio-3006 and 2022-Ohio-3007.

_____

DEWINE, J., announced the judgment of the court, with an opinion joined by FISCHER and DETERS, JJ.  DONNELLY, J., concurred in judgment only, with an

opinion. STEWART, J., concurred in judgment only, with an opinion. KENNEDY, C.J., dissented, with an opinion joined by BRUNNER, J.

**DEWINE, J., announcing the judgment of the court.**

{¶ 1} A police officer pulled over a car because he had information that the car's owner had a suspended driver's license. But when he walked up to the car, the officer realized that the car was not being driven by its owner. The officer asked the driver for his license and discovered that he also did not have a valid driver's license. Ultimately, an illegal firearm was found in the vehicle and the driver and a passenger were arrested.

{¶ 2} No one disputes that the police officer had probable cause to initiate the stop. The question we confront in this case is whether the officer violated the Fourth Amendment by asking the driver for his license after he realized that the driver was not the car's owner. We conclude that he did not. Under controlling United States Supreme Court precedent, an officer who has properly executed a traffic stop may make ordinary inquiries necessary to complete the mission of the traffic stop—including confirming that the driver has a valid driver's license. *See Rodriguez v. United States*, 575 U.S. 348, 355 (2015).

{¶ 3} The Eleventh District Court of Appeals held that the trial court erred in not suppressing evidence that was found in the car. Because we disagree, we reverse the judgments of the court of appeals and reinstate the judgments of the trial court.

## I. Background
### *A. An officer stops a suspected unlicensed driver*

{¶ 4} Officer Andrew Centrackio sat in a parking lot running registration checks on the license plates of passing vehicles using the Law Enforcement Automated Data System (more commonly known as "LEADS"). Among the cars he checked was a Kia Forte with a rear temporary tag. The inquiry revealed that

the Kia's owner, Jessica Dunlap, had a suspended driver's license. LEADS also provided some of Dunlap's identifying traits, including her gender, height, age, and weight.

{¶ 5} Acting on the information from LEADS, Officer Centrackio pulled the Kia over based on his suspicion that a suspended driver was behind the wheel. It was not until he walked up to the driver-side window that he realized that the car was not being driven by its owner: Jessica Dunlap is a white female, but the driver, later identified as Je'Brel Lewis, was an African American male. Dunlap was a passenger in the vehicle.

{¶ 6} Officer Centrackio informed Lewis that he had pulled the car over because the registered owner had a suspended license. Referencing Dunlap, Lewis responded that "she got court for that." Officer Centrackio then asked Lewis if his license was valid. Lewis responded, "I believe I'm valid. If not, she's valid."

{¶ 7} At that point, Officer Centrackio asked Lewis for his license. Lewis instead pulled out a state-issued identification card. While walking back to the patrol car, Officer Centrackio said, "If you're valid, you guys are good to go." After running the information in LEADS, Officer Centrackio learned that Lewis also had a suspended license. Because neither Lewis nor Dunlap had a valid driver's license, he called for a tow truck and prepared to conduct an inventory search.

{¶ 8} From LEADS, Officer Centrackio knew that Lewis had active arrest warrants and that his prior charges included improper handling of firearms in a motor vehicle. He asked Lewis whether there were any weapons in the vehicle. Lewis stated that there was an unloaded firearm located in the front passenger-side door and gave the officer permission to search the car. The search revealed the firearm in the front passenger-side door and a loaded magazine on the floor of the back seat.

B. *The court of appeals rules that the evidence found in the car should be suppressed*

{¶ 9} Dunlap and Lewis were each indicted on one count of improperly handling firearms in a motor vehicle. They both filed motions to suppress the evidence discovered in the car, arguing that the officer had unlawfully prolonged the stop after he realized that Dunlap was not driving.

{¶ 10} At a consolidated hearing on the suppression motions, Officer Centrackio testified that he asked Lewis for his license to "determine if he was valid" and "legally able to drive the vehicle." He also said that he asked for identification in order to document Lewis's identity in an incident report that is generated each time he stops a vehicle.

{¶ 11} The trial court denied the motions to suppress. Both defendants pled no contest and appealed to the Eleventh District. On appeal, they argued that although the initial stop was justified, the officer violated the Fourth Amendment by continuing the stop after he realized that Lewis was not driving the car.

{¶ 12} The Eleventh District reversed the trial court's denial of the motion to suppress in both cases. *State v. Dunlap*, 2022-Ohio-3007 (11th Dist.); *State v. Lewis*, 2022-Ohio-3006 (11th Dist.). It held that once Officer Centrackio realized that Dunlap was not the driver, he no longer had reasonable suspicion for the stop. *Dunlap* at ¶ 19; *Lewis* at ¶ 19. Therefore, the court reasoned, it was impermissible for the officer to continue the stop to ask Lewis for identification. *See id.* Because "the extension of the stop was improper once [Officer] Centrackio recognized Dunlap was not the driver," the court of appeals held that the firearm that was discovered as a result of the continued detention must be suppressed. *Lewis* at ¶ 29; *see also Dunlap* at ¶ 29.

{¶ 13} The Eleventh District acknowledged that its decisions were in conflict with the Ninth District's decision in *State v. Graves*, 1993 WL 261562 (9th Dist. July 14, 1993), and certified the conflicts to this court. In *Graves*, an officer

stopped a car because its owner had an outstanding warrant, but after executing the stop the officer realized the car's owner was not the person driving the car. Nonetheless, the Ninth District found that it was permissible for the officer to ask the driver for identification, explaining that "once a motor vehicle is legitimately stopped, * * * the slight intrusion of asking the driver for identity is neither unwarranted, nor prohibited." *Id.* at *2, citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

{¶ 14} This court accepted both appeals, determined that the conflicts did exist, and consolidated all four cases for review. *See* 2022-Ohio-4670.

## II. We Reverse the Court of Appeals and Reinstate the Convictions

{¶ 15} The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Ohio Constitution also prohibits "unreasonable searches and seizures." Ohio Const., art. I, §14. But in this court and in the proceedings below, Lewis and Dunlap have framed their argument under the Fourth Amendment and have failed to assert that the Ohio Constitution provides any greater protections. Thus, we are constrained to consider only whether Lewis's and Dunlap's rights under the Fourth Amendment were violated. *See State v. Burroughs*, 2022-Ohio-2146, ¶ 11.

### A. The officer had reasonable suspicion to make the stop

{¶ 16} The United States Supreme Court has held that the reasonableness of a traffic stop under the Fourth Amendment should be evaluated in a manner more akin to the brief detention of a permissible *Terry* stop than to a formal arrest. *See Berkemer*, 468 U.S. at 439, citing *Terry v. Ohio*, 392 U.S. 1 (1968). As is true of a *Terry* stop, an officer initiating a traffic stop must have reasonable suspicion—or, in other words, a "'particularized and objective basis for suspecting the particular

person stopped of criminal activity,' " *Kansas v. Glover*, 589 U.S. 376, 380 (2020), quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981).[1]

{¶ 17} Officer Centrackio had reasonable suspicion to stop the vehicle. The United States Supreme Court has recently made clear that an officer does not violate the Fourth Amendment "by initiating an investigative traffic stop after running a vehicle's license plate and learning that the registered owner has a revoked driver's license," *id.* at 378. Such a stop is reasonable as long as "the officer lacks information negating an inference that the owner is the driver of the vehicle." *Id*. Thus, Officer Centrackio was entitled to make the traffic stop based on the information acquired from LEADS indicating that the owner of the vehicle did not have a valid driver's license.

*B. Officer Centrackio did not violate the Fourth Amendment by asking Lewis if he had a valid driver's license*

{¶ 18} Everyone agrees that the stop was legal. Nor is there any dispute that after Lewis produced a state-issued identification card rather than a driver's license, Officer Centrackio had cause to detain him on suspicion of operating a vehicle without a license. So the question before us is whether the officer committed a constitutionally impermissible seizure by asking Lewis if he had a valid driver's license. The United States Supreme Court's decision in *Rodriguez v. United States* makes clear that he did not. 575 U.S. 348 (2015).

{¶ 19} In *Rodriguez*, an officer detained a driver after completing a traffic stop in order to conduct a canine search of his vehicle. *Id*. at 348. The court held

---

1. The dissent purports to find support for its rationale in *Glover*, asserting that the United States Supreme Court's discussion in that case about circumstances in which an officer lacks reasonable suspicion to engage in a traffic stop "supports the conclusion that . . . Officer Centrackio . . . lacked authority to continue to detain the driver." Dissenting opinion, ¶ 46. But as the dissent concedes, *Glover* dealt solely with an officer's initial authority to make a traffic stop, not the scope of appropriate inquiries once an officer has made a lawful stop. Quite simply, nothing in *Glover* addresses or bears upon the issue in this case of an officer's permissible scope of inquiry after engaging in a lawful traffic stop.

that absent reasonable suspicion, police may not extend an otherwise completed traffic stop to conduct a dog sniff. *Id*. at 355. Importantly, though, the court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, . . . and attend to related safety concerns." (Citation omitted.) *Id.* at 354, quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The court explained that "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' " *Id.* at 355, quoting *Caballes* at 408. "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id*. Actions outside the mission would cause the stop to become unlawful if they "'measurably extend the duration of the stop,' " *id*., quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

{¶ 20} The court explained that ordinary inquiries—such as checking a driver's license—are within a stop's mission because they serve the same objective as the initial stop: to enforce the traffic code and to "ensur[e] that vehicles on the road are operated safely and responsibly." *Id.* at 355. In addition to furthering the interests of traffic enforcement, these ordinary inquiries also protect officers. *Id.* at 356. Because "[t]raffic stops are 'especially fraught with danger to police officers,' . . . an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id*., quoting *Johnson* at 330.

{¶ 21} Thus, completing the mission of the traffic stop in this case allowed Officer Centrackio to make the "ordinary inquiries" of such a stop, including "checking the driver's license." *Rodriguez*, 575 U.S. at 356, 355. Officer Centrackio stopped the car because he had a reasonable suspicion that the driver did not have a valid license. His question—"Are you valid?"—was also consistent with the stop's mission of ensuring that the vehicle was being operated by a

properly licensed driver. *See id.*; *see also Glover*, 589 U.S. at 381 ("empirical studies demonstrate what common experience readily reveals: Drivers with revoked licenses frequently continue to drive and therefore to pose safety risks to other motorists and pedestrians").

{¶ 22} In arguing to the contrary, the dissent swings at a straw man, claiming that "[u]nder the lead opinion's reasoning, every officer has the authority to require a driver to produce a license—in any context—simply because any driver on the road could potentially have a suspended license," dissenting opinion at ¶ 61. But of course, that is nothing close to what we have said. Rather, we simply conclude that when an officer permissibly engages in a traffic stop based on a reasonable suspicion that a car is not being operated by a validly licensed driver, the officer may ask the driver of the car if he has a valid license.

{¶ 23} There is nothing novel about this conclusion. It follows precisely what the United States Supreme Court pronounced in *Rodriguez*—that once an officer has initiated a lawful stop, the officer may make ordinary inquiries incident to the stop, including checking the driver's license status. *Rodriguez* at 355. And numerous lower courts have read *Rodriguez* the same way we do.

{¶ 24} Subsequent to *Rodriguez,* courts have widely concluded that part of the permissible mission of a lawful traffic stop is to ensure that a car is operated by a properly licensed driver and have thus upheld officers' requests for licenses even after the initial reason for the stop was resolved. *See, e.g.*, *People v. Cummings*, 2016 IL 115769, ¶ 20 ("The United States Supreme Court's decision in *Rodriguez* makes clear that a driver's license request of a lawfully stopped driver is permissible irrespective of whether that request directly relates to the purpose for the stop"); *State v. Smith*, 2018 WI 2, ¶ 2 ("We hold that when an officer conducts a valid traffic stop, part of that stop includes checking identification, even if the reasonable suspicion that formed the basis for the stop in the first place has dissipated"); *United States v. Nault*, 41 F.4th 1073 (9th Cir. 2022) (officer who

stopped car because owner had an active warrant was entitled to ask driver for license even after it was clear that the car's owner was not the driver); *United States v. Yancey*, 928 F.3d 627, 628, 631 (7th Cir. 2019) (when driver was arrested and passenger sought to leave with vehicle, mission of traffic stop included checking passenger's driver's license to ensure that he could legally drive); *United States v. Vargas*, 848 F.3d 971 (11th Cir. 2017) (determining whether potential driver had a license is part of mission of the stop).

{¶ 25} In holding otherwise, the Eleventh District did not mention the United States Supreme Court's decision in *Rodriguez*. Instead, it premised its holding on *State v. Chatton*, 11 Ohio St.3d 59, 463 N.E.2d 1237 (1984), a decision of this court construing the Fourth Amendment that predates *Rodriguez*. The dissent also relies on *Chatton*, reasoning that *Rodriguez* does not control because of dissimilar facts. But *Chatton* also involved different facts—facts that are legally distinguishable from those at bar.

{¶ 26} In *Chatton*, an officer initiated a traffic stop after observing a vehicle without a front or back license plate. *Id.* at 59. As the officer walked toward the car, he saw a temporary tag on the rear of the vehicle. *Id*. Nevertheless, the officer continued walking to the driver-side window and completed the stop. *Id*. We concluded that once the officer saw the temporary tag, he had no further authority to detain the driver. *Id*. at 61.

{¶ 27} This case is factually distinguishable from *Chatton* in that *Chatton* involved a car's registration status while this case involves a driver's license status. As the state explains, once the officer saw the temporary tag, the entire mission of the stop—confirming that the car was registered—was completed.

{¶ 28} In contrast, the mission of the stop in this case was to ensure that a licensed driver was behind the wheel. Unlike in *Chatton*, information was not presented prior to the officer's approach that dispelled the suspicion and resolved the mission of the stop. Here, Officer Centrackio's mission was not completed until

he ascertained whether the driver of the vehicle had a valid license. Whether Dunlap or any other driver was operating the vehicle, completing the mission of the stop included the "'ordinary inquir[y] incident' " to the stop of checking the driver's license. *Rodriguez*, 575 U.S. at 355, quoting *Caballes*, 543 U.S. at 408.

{¶ 29} Though the facts here are different than those in *Chatton*, our disposition of this case does not depend solely on that distinction. When it comes to the interpretation of the Fourth Amendment, we are bound to defer to the United States Supreme Court. *See Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) (United States Supreme Court's interpretation of the federal constitution "is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect on the States"). And that court has made it clear that once a police officer has lawfully initiated a traffic stop, the mission of the stop includes asking the driver for a driver's license. To the extent that *Chatton* could be read to suggest otherwise, it has been superseded by the United States Supreme Court's decision in *Rodriguez*.

### III. Conclusion

{¶ 30} We reverse the judgments of the Eleventh District Court of Appeals and reinstate the judgments of the trial court.

Judgments reversed.

_____

**DONNELLY, J., concurring in judgment only.**

{¶ 31} I concur in the majority's judgment, but I believe that the specific facts of this case warrant a narrower holding than the one suggested by the lead opinion. This court need not hold that a police officer may extend any valid traffic stop to check the driver's license, even in the absence of continued reasonable suspicion, because that is not what happened when Officer Andrew Centrackio stopped appellants, Je'Brel Lewis and Jessica Dunlap. Instead, the matter should be resolved by holding that when a police officer has reasonable suspicion to stop

a vehicle and that suspicion is not dispelled until the officer is standing next to the driver's window, the officer may briefly interact with the driver without violating the Fourth Amendment. And if, as here, the driver's statements give rise to a reasonable suspicion that the driver does not have a valid license, the officer may extend the stop to check the validity of the driver's license.

{¶ 32} Officer Centrackio stopped the vehicle at issue in this case because he believed that the vehicle's owner, Dunlap, was committing the crime of driving with a suspended license. Only after the officer walked up to the driver's window did he see that Dunlap was not the driver. The officer then engaged in approximately ten seconds of conversation with the driver and passenger, during which he greeted them, explained that he had stopped the vehicle because Dunlap's license was suspended, inferred that Dunlap was the passenger, asked the driver, Lewis, if he had a valid driver's license, and received a suspicious answer: "I believe I'm valid. If not, she's valid." In addition to being illogical, Lewis's answer was clearly untrue given that the officer had just said that Dunlap's license was not currently valid. At that point, Officer Centrackio asked for Lewis's license to verify its validity.

{¶ 33} The Fourth Amendment does not allow for warrantless, suspicionless traffic stops in order to verify the validity of a driver's license. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). However, when a vehicle has been properly stopped, a police officer may briefly question the vehicle's occupants— even after the purpose of the stop has ended—under certain circumstances. *See State v. Robinette*, 1997-Ohio-343, ¶ 24.

{¶ 34} In *Robinette*, a police officer stopped Robinette for speeding, gave him a warning, and then asked him if he had any contraband in the car such as drugs or weapons. *Id*. at ¶ 1. After Robinette answered no, the officer asked to search the car and ultimately seized a container of illegal drugs. *Id*. Although this court held that the search was invalid, it held that the officer's initial questions were

constitutionally permissible. *Id*. at ¶ 25-29. We indicated that a suspicionless extension of a traffic stop is permissible so long as the detention is brief, the questioning is minimally intrusive, and the questioning serves the public interest. *Id*. at ¶ 25.

{¶ 35} In this case, the parties do not dispute that Officer Centrackio validly initiated a traffic stop. After the original reasonable suspicion for the stop was dispelled, the officer prolonged the suspicionless portion of the stop for a mere ten seconds and asked only two questions: "How's it going?" and "Are you valid?" The latter question served the same interest that justified the stop in the first place: to keep suspended drivers off Ohio roads. Like the questioning in *Robinette*, the brief questioning in this case was valid. But in contrast to *Robinette*, Lewis's answer gave rise to the reasonable suspicion that Lewis did not have a valid driver's license. Based on Lewis's suspicious answer, Officer Centrackio was justified in extending the traffic stop to check the validity of Lewis's license.

{¶ 36} Under these specific circumstances, Officer Centrackio did not violate Lewis's or Dunlap's Fourth Amendment rights. Thus, the evidence obtained after the license verification did not need to be suppressed. Accordingly, I concur in the majority's judgment reversing the Eleventh District Court of Appeals and reinstating the trial court's judgment denying the motions to suppress. Because I would base this judgment on narrower grounds than the lead opinion, I concur in judgment only.

---

**STEWART, J., concurring in judgment only.**

{¶ 37} *Rodriguez v. United States*, 575 U.S. 348 (2015), does not resolve the question before us. Nonetheless, I would reverse the judgments of the Eleventh District Court of Appeals and reinstate the judgments of the trial court—but on different grounds than the lead opinion. For these reasons, I concur in judgment only.

{¶ 38} I agree with the lead opinion that there is no dispute that the officer had reasonable suspicion to initiate the traffic stop based on the information he received that the vehicle's owner had a suspended driver's license. The more specific question presented here, however, is whether that reasonable suspicion terminated when the officer realized as he approached the vehicle, based on the outward appearance of the driver, that the car was not being driven by its owner. This particular question was not present in *Rodriguez.*

{¶ 39} The Fourth Amendment to the United States Constitution prohibits *unreasonable* searches and seizures. And driving a vehicle on public roadways is a privilege for which the state issues and requires licensure. *See* R.C. 4507.35(A) (requiring that the operator of a motor vehicle "furnish satisfactory proof that the operator has a driver's license, upon demand of any peace officer"). Additionally, this court has held that a driver's license checkpoint program does not necessarily violate the Fourth Amendment; the court evaluated such a checkpoint under the following three-prong analysis: (1) the checkpoint's intrusion on privacy, (2) the state's interest in maintaining the checkpoint, and (3) the extent to which the checkpoint advances the state's interest. *State v. Orr*, 2001-Ohio-50, ¶ 10. In so holding, this court reasoned that such checkpoints advance the state's interest in "ensuring that only those qualified to do so are permitted to operate motor vehicles and hence that licensing requirements are being observed" and require only a minimal intrusion on privacy. *Id.* at ¶ 12. In *Orr*, we described the checkpoint procedure as follows:

Drivers who were unable to produce a valid driver's license had their names, dates of birth, and Social Security numbers entered into the officers' computers to check whether they possessed a valid license. If the computer showed that a driver was properly licensed and was not wanted by the police for any reason, the driver [was]

given the pamphlet, thanked, and released back into traffic. This entire process [took] an additional two minutes or so to complete. Drivers without a valid license were cited for the violation, which added approximately ten minutes to the overall length of detention.

*Id.* at ¶ 3.

{¶ 40} Similar to the minimal intrusion involved in advancing the state's interest in *Orr*, as the lead opinion points out here, the officer told the driver, appellant Je'Brel Lewis, while walking back to the patrol car to check Lewis's identification card, "If you're valid, you guys are good to go." Lead opinion, ¶ 7. This demonstrates that the scope of the officer's inquiry was to determine whether a licensed driver was operating the vehicle. The United States Supreme Court held in *Delaware v. Prouse*, 440 U.S. 648, 663 (1979), that the Fourth Amendment prohibits arbitrary police stops for the purpose of checking a driver's license and registration. But here, the stop was not arbitrary. As discussed above, the officer had reasonable suspicion to initiate the stop. Thus, I would find that the specific circumstances of this case are more analogous to *Orr* than to *Prouse* or *Rodriguez*.

{¶ 41} Based on the foregoing, I conclude that the trial court properly denied the motions to suppress. Accordingly, I concur in the majority's judgment reversing the Eleventh District Court of Appeals' judgment reversing the trial court. But because my reasoning differs from the lead opinion's, I concur in judgment only.

_____

**KENNEDY, C.J., joined by BRUNNER, J., dissenting.**

{¶ 42} Officer Andrew Centrackio ran a vehicle license plate through a law-enforcement database. That vehicle was registered to an owner, appellee Jessica Dunlap, whose operator's license was suspended. Without having seen the driver

to determine whether the driver matched the physical description of the owner, Officer Centrackio stopped the vehicle.

{¶ 43} In *Kansas v. Glover*, the United States Supreme Court declared that "the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " 589 U.S. 376, 380 (2020), quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). This is the reasonable-suspicion standard. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989), citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Based on the standard set forth in *Glover*, because Officer Centrackio had not seen the driver's physical characteristics, he had a reasonable suspicion that the registered owner was engaged in the criminal activity of driving with a suspended license.

{¶ 44} However, the reasonable-suspicion standard "'takes into account the totality of the circumstances,' " *Glover* at 386, quoting *Navarette v. California*, 572 U.S. 393, 397 (2014), so "the presence of additional facts might dispel reasonable suspicion," *id*. In this case, Officer Centrackio's suspicion was dispelled as he approached the vehicle because he saw that Dunlap was not driving—something that he admitted on both the dash-camera video and at the suppression hearing. At that moment, Officer Centrackio no longer had reasonable suspicion that Dunlap had committed a crime.

{¶ 45} But this case is not about the initial stop. And contrary to the lead opinion's characterization, this case is not about an extended stop. Rather, it falls between the bookends of the United States Supreme Court's precedent in *Glover* (setting forth when an officer has reasonable suspicion to initiate a traffic stop) and in *Rodriguez v. United States*, 575 U.S. 348 (2015) (setting forth when an officer has reasonable suspicion to extend a traffic stop and make inquiries). And the question presented by this case is straightforward: When a law-enforcement officer obtains information after initiating a stop that dispels the officer's reasonable

suspicion for the stop, is the officer justified in continuing to detain the driver of the vehicle?

{¶ 46} The answer is no, and the language in *Glover* narrowing the scope of the Court's holding informs this answer. That language supports the conclusion that when Officer Centrackio obtained further information establishing that the suspected crime that had given him reasonable suspicion to initiate the stop had not been committed, he then lacked authority to continue to detain the driver. Accordingly, I dissent and would affirm the judgment of the Eleventh District Court of Appeals.

### *Kansas v. Glover*

{¶ 47} At the outset, it is important to recognize the limits of the Court's holding in *Glover*. In that case, the Court focused on the validity of the stop and considered only the "information possessed by the officer at the time of the stop" (emphasis omitted), *Glover*, 589 U.S. at 386, fn. 2. The Court therefore did not address the issue before this court today: whether a seizure is reasonable when an officer's reasonable suspicion for initiating a stop is dispelled by information obtained after the stop occurred but prior to further inquiries.

{¶ 48} "It is a rule of universal application that general expressions used in a court's opinion are to be taken in connection with the case under consideration." *Bramwell v. U.S. Fidelity & Guar. Co.*, 269 U.S. 483, 489 (1926). Therefore, because the Court in *Glover* considered only the reasonableness of the initial stop, *Glover* does not control when this court is determining the reasonableness of actions taken after the initial stop has been made.

{¶ 49} In *Glover*, the United States Supreme Court considered "whether a police officer violat[ed] the Fourth Amendment by initiating an investigative traffic stop after running a vehicle's license plate and learning that the registered owner [had] a revoked driver's license." *Glover* at 378. The Court held that long as "the officer lacks information negating an inference that the owner is the driver of the

vehicle, the stop is reasonable," *id.* Or phrased differently, in those circumstances, an officer no longer has reasonable suspicion to stop a vehicle if the officer learns that the owner of the vehicle (i.e., the person known to have a suspended license) is not driving. Despite concluding that the stop at issue in that case was reasonable, the Court provided an example of when an officer's reasonable suspicion would be dispelled prior to initiating a stop. *Id.* at 386. "[I]f an officer knows that the registered owner of [a] vehicle is in his mid-sixties but observes that the driver [of the vehicle being stopped] is in her mid-twenties, then the totality of the circumstances would not 'raise a suspicion that the particular individual being stopped is engaged in wrongdoing.' " *Id.*, quoting *Cortez*, 449 U.S. at 418.

### *Rodriguez v. United States*

**{¶ 50}** The United States Supreme Court has also considered when it is reasonable for an officer to extend a traffic stop. In *Rodriguez*, 575 U.S. 348, the court considered whether it was reasonable for a police officer to extend a traffic stop for a moving violation to conduct a dog sniff of a vehicle. *Id.* at 350. The Court held that absent reasonable suspicion of criminal activity, an extension is unreasonable. *See id.* at 355. It stated that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission,'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Id.* at 354.

**{¶ 51}** The Court further explained that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350. "Authority for the seizure thus ends when tasks tied to the *traffic infraction* are—or reasonably should have been—completed." (Emphasis added.) *Id.* at 354. The Court also explained that checking the driver's license was an ordinary inquiry incident to the mission of the stop. *See id.* at 355-356.

**{¶ 52}** The decisions of the United States Supreme Court are binding on this court. *See State v. Burnett*, 2001-Ohio-1581, ¶ 16. However, the Supreme Court has never directly addressed the reasonableness of a seizure in which the officer's reasonable suspicion for initiating the stop is dispelled by evidence obtained prior to the officer's extending the stop to make informational inquiries. What the Court wrote in *Glover* should inform this court's decision today. But so should another case, *State v. Chatton*, 11 Ohio St.3d 59 (1984).

### State v. Chatton

**{¶ 53}** In *Chatton*, this court considered "whether [a] police officer, having detained [a driver] for a suspected traffic violation, continued to possess the authority to detain [the driver] . . . once the officer no longer had reason to suspect that [the driver] was committing any traffic violation." *Id.* at 60. In *Chatton*, the officer initiated a traffic stop based on a reasonable suspicion that the driver's vehicle was not properly licensed or registered. *Id.* at 59, 63. After initiating the stop, the officer approached the vehicle and realized that the proper vehicle registration was present in the rear window. *Id.* This court explained that "because the police officer no longer maintained a reasonable suspicion that [the driver's] vehicle was not properly licensed or registered, to further detain [the driver] and demand that he produce his driver's license [was] akin to the random detentions struck down by the [United States] Supreme Court in *Delaware v. Prouse*[, 440 U.S. 648 (1979)]." *Chatton* at 63.

**{¶ 54}** The lead opinion says that *Rodriguez* overrules *Chatton*, but that is wrong. *Chatton* sits in the space between *Glover*—which addresses when an initial traffic stop of a registered vehicle belonging to an owner who is under a license suspension is valid—and *Rodriguez*—which held that an officer may not prolong a traffic stop to investigate potential criminality unrelated to the stop once its mission has been completed. Importantly, the mission for the stop in *Rodriguez*, a traffic infraction for a moving violation, had not been completed at the time the officer

18

asked the driver to produce his driver's license. Because *Chatton* has not been undermined by either decision and is on point, this court should adhere to and apply it today. *See id.*

### Application to this Case

**{¶ 55}** In applying *Glover*, *Rodriguez*, and *Chatton*, this court must determine where the case before us sits in the framework of how the Fourth Amendment applies to traffic stops. According to the United States Supreme Court, "'[e]ach case is to be decided on its own facts and circumstances.'" *Ornelas v. United States*, 517 U.S. 690, 696 (1996), quoting *Ker v. California*, 374 U.S. 23, 33 (1963).

**{¶ 56}** Like the officer in *Glover*, Officer Centrackio had reasonable suspicion to initiate a traffic stop of a vehicle because he had no information to dispel his suspicion that the driver lacked a license. Running a license-and-registration check in the Law Enforcement Automated Data System ("LEADS") showed Officer Centrackio that the registered owner of the passing vehicle had a suspended license. Since Officer Centrackio did not see the driver, his suspicion that the registered owner was engaged in the criminal activity of driving with a suspended license was reasonable.

**{¶ 57}** However, when Officer Centrackio encountered the driver of the vehicle, he observed that the driver, appellee Je'Brel Lewis, did not match the description of the registered owner, Dunlap. The LEADS report described the physical characteristics of the registered owner, and Officer Centrackio knew that the registered owner was a white female. Lewis is a black male. On the dash-camera video, Officer Centrackio admits, "As soon as I got to the car, I realized it wasn't her." At that moment, he learned information that negated his initial inference that Dunlap was engaged in the criminal activity of driving with a suspended license. Therefore, as was the case for the officer in *Chatton*, Officer Centrackio's reasonable suspicion to make the stop was dispelled.

**{¶ 58}** In an attempt to avoid the holding in *Chatton*, the lead opinion asserts that the mission of the stop in this case was to "ensure that a licensed driver was behind the wheel," lead opinion, ¶ 28. But by characterizing the mission so broadly, the lead opinion expands the officer's actual, more nuanced basis for effecting the stop. There is no constitutionally valid explanation for the mission being to ensure that *any* driver of the vehicle was licensed when the officer's suspicion—the constitutional foundation of the stop—was that a *specific* individual was driving without a license. Officer Centrackio testified at the suppression hearing that he performed the traffic stop "solely because of the registered owner not being licensed." The mission of the stop therefore ended when Officer Centrackio learned that Dunlap was not driving the vehicle. To allow a police officer to continue to detain a driver when reasonable suspicion of criminal activity no longer exists is tantamount to allowing a police officer to approach any car and request that its driver produce a license to ensure that a licensed driver is behind the wheel. Officer Centrackio's true mission here was to determine whether Dunlap was driving. She was not.

**{¶ 59}** The lead opinion also attempts to distinguish *Chatton* by arguing that in this case, "[u]nlike in *Chatton*, information was not presented prior to the officer's approach that dispelled the suspicion," lead opinion at ¶ 28. This distance-from-the-driver rule is unpersuasive—it does not make a difference that the reasonable suspicion in *Chatton* evaporated when the officer reached the rear window of the car while Officer Centrackio lost reasonable suspicion upon reaching the driver's-side window. Importantly, in *Chatton*, the officer's suspicion was dispelled "as he reached . . . the vehicle . . . [and] observed a temporary license placard . . . on the rear deck of the vehicle directly beneath the rear window." *Chatton* at 59. Here, the officer's suspicion was dispelled when he reached the driver's-side window and observed that Dunlap was not the driver. In both *Chatton* and this case, the officer's suspicion was dispelled after the initial stop but prior to

any additional inquiries. At that time, there was nothing left for the officer to investigate.

{¶ 60} The lead opinion is wrong when it asserts that this case is controlled by *Rodriguez*. Unlike in *Rodriguez*, the reasonable suspicion of criminal activity in this case was dispelled before the officer made additional inquiries. Here, the traffic infraction that Officer Centrackio believed Dunlap had committed was driving with a suspended license. The facts show that Officer Centrackio knew that Dunlap was not the driver as soon as he reached the car's window, before he asked for identification. Since the physical descriptions of Lewis and Dunlap were so different, it was not reasonable for Officer Centrackio to ask for Lewis's driver's license as an "'ordinary inquir[y] incident to [the traffic] stop,' " (bracketed text added in *Rodriguez*) *id.* at 355, quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005), because he already knew that the traffic infraction he was investigating had not occurred. That is in contrast to *Rodriguez*, in which the mission of the traffic stop had not yet been completed when the officer requested the driver's identification.

{¶ 61} Only if Officer Centrackio possessed a reasonable suspicion that Lewis was engaged in criminal activity could he have lawfully extended the stop to ask for identification. The lead opinion's conclusion that Officer Centrackio was authorized to continue to detain the driver—notwithstanding the fact that the reasonable suspicion that had prompted the stop had been dispelled—solely for the purpose of "ensur[ing] that a licensed driver was behind the wheel," lead opinion, ¶ 28, turns the constitutional protections against unreasonable search and seizure into a hollow reed. Under the lead opinion's reasoning, every officer has the authority to require a driver to produce a license—in any context—simply because any driver on the road could potentially have a suspended license. That is not the law in this country.

## Conclusion

{¶ 62} Officer Centrackio violated the Fourth Amendment when he continued to detain Lewis and Dunlap after discovering that Dunlap was not driving. Relying on *Glover* and *Chatton*, I would hold that the reasonable suspicion of criminal activity that Officer Centrackio possessed when he initiated the traffic stop was dispelled when he learned information that negated his belief that Dunlap was driving with a suspended license. He therefore could not detain Dunlap and Lewis after he learned that information. For this reason, I would affirm the judgment of the Eleventh District Court of Appeals. Because the majority does otherwise, I dissent.

_____

James R. Flaiz, Geauga County Prosecuting Attorney, and Nicholas A. Burling, Assistant Prosecuting Attorney, for appellant.

Elizabeth Miller, Ohio Public Defender, and Kathleen Evans, Assistant Public Defender, for appellee Jessica Dunlap.

Rachel A. Kopec, for appellee Je'Brel Lewis.

Dave Yost, Ohio Attorney General, Benjamin M. Flowers, Solicitor General, Stephen Carney, Deputy Solicitor General, and Amanda L. Narog, Senior Assistant Attorney General, urging reversal for amicus curiae, Ohio Attorney General Dave Yost.

_____